642 A.2d 634

**MIKE'S SIGN COMPANY, Petitioner,**

v.

**DEPARTMENT OF TRANSPORTATION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 14, 1994.

Decided May 24, 1994.

Kathy G. Wingert, for petitioner.

Donald J. Smith, Asst. Counsel, for respondent.

Before DOYLE and FRIEDMAN, JJ., and DELLA PORTA, Senior Judge.

FRIEDMAN, Judge.

Mike's Sign Company (Mike's) appeals from an order of the Secretary of the Department of Transportation which affirmed revocation of Mike's permit for an outdoor advertising device.

Pursuant to its regulations,[1] the Department of Transportation (DOT) revoked Mike's permit for a sign located adjacent to Interstate 81 in Middlesex Township because the sign "suffered extensive storm related damage" in a windstorm on April 8, 1991. (R.R. at 1a.) DOT's regulations provide that a nonconforming sign destroyed or damaged in a natural disaster, such as a storm, so that less than 50% of the sign remains intact can be rebuilt only in conformance with the regulations governing outdoor advertising devices.[2] DOT's real estate specialist, Kermit Fullmer (Fullmer), visited and photographed this site within days of the storm. However, Mike's had decided to make repairs and had begun cleanup activities at the time of this initial visit. Fullmer made additional visits

1. 67 Pa.Code § 445.7 provides in pertinent part:

(b) *Nonconforming signs.* Nonconforming signs shall conform with the following:

(1) If a sign is damaged or destroyed as a result of tortious conduct such as vandalism, the sign may be repaired or replaced by the sign owner.

(2) If a sign is damaged as a result of natural disaster or nontortious conduct so that 50% or more of its value remains intact, the sign may be repaired by the sign owner.

(3) The following apply to signs damaged or destroyed as provided in paragraphs (1) and (2):

. . . .

(iv) If a sign is destroyed or damaged as a result of natural disaster or other nontortious conduct so that less than 50% of the sign remains intact, the sign may be repaired or replaced only in compliance with the provisions of this chapter. Determination of the value of the sign and the damage shall be made by the Department.

2. Nonconforming signs are those which were legal when erected but which do not now conform to the requirements of the Outdoor Advertising Control Act, Act of 1971, P.L. 596, *as amended,* 36 P.S. §§ 2718.101–2718.115 and its implementing regulations. Mike's sign is nonconforming because it is located in a residential farm zone in which outdoor advertising devices, such as this sign, are not permitted.

to the site as repair progressed. The repairs, costing approximately $6,000.00, were completed by June of 1991. DOT subsequently revoked the sign permit based upon its conclusion that the sign had been damaged by a storm so that less than 50% of it remained intact.[3] Mike's disagreed with the permit revocation, contending that vandalism, rather than the April 8, 1991 storm, was responsible for damage to the sign.[4] At Mike's request, a hearing was held on April 9, 1992. At the hearing, Fullmer expressed his opinion that the sign was damaged by the storm. Mike's presented evidence of vandalism. The hearing officer concluded that the sign was destroyed by a windstorm so that less than 50% of its structure was intact after the storm and that there was insufficient evidence of vandalism to support Mike's argument that tortious conduct caused the sign to fall. (Hearing Officer's Conclusions of Law, Nos. 2, 3, 5.) By order of June 17, 1993, DOT's Secretary finalized the hearing officer's proposed report, affirming the permit revocation. Mike's appealed to this court.

■ On appeal,[5] Mike's contends that (1) substantial evidence does not support the hearing officer's findings that vandalism did not cause the sign to fail; (2) substantial evidence does not support the hearing officer's finding that more than 50% of the sign was damaged by the storm; and (3) substantial evidence does not support the hearing officer's

3. Because DOT revoked the permit on the basis of physical damage, it made no determination of loss of value.

4. A sign damaged or destroyed by vandalism or other tortious conduct may be reconstructed even if totally destroyed. Thus, if the sign was damaged as a result of vandalism, the percent of destruction is immaterial and the basis for the revocation would disappear.

5. Our scope of review on appeal from an administrative agency decision is whether necessary findings of fact are supported by substantial evidence, whether an error of law has been committed or whether constitutional rights have been violated. 2 Pa.C.S. § 704. Substantial evidence is such relevant evidence as a reasonable mind might find acceptable to support a conclusion; findings supported by substantial evidence are conclusive on review. *Pine Haven Residential Care Home v. Department of Public Welfare,* 99 Pa.Commonwealth Ct. 1, 512 A.2d 59 (1986).

refusal to find DOT's revocation of the sign permit barred by laches or estoppel.

■ As to the first issue, Mike's argument hinges on the doctrine of incontrovertible physical facts.[6] Relying on this doctrine, Mike's contends that Fullmer's testimony that the sign damage resulted from the storm must be rejected because it is contrary to scientific and engineering principles. The concept of incontrovertible physical facts provides that

> [c]ourts may properly refuse to admit evidence which is contrary to scientific principles or in conflict with natural laws. 29 Am.Jur.2d *Evidence* § 261 (1967); 30 Am.Jur.2d *Evidence* § 1086 (1967). Thus, our Supreme Court has held that courts are not required to believe that which is con-

---

**6.** Also included in Mike's first argument are the contentions that the hearing officer ignored substantial evidence in the record that the sign damage was due to vandalism and that DOT bore, and did not meet, the burden of proving that the sign's damage was *not* due to vandalism. DOT disagrees with both of these contentions, claiming that substantial evidence does support the hearing officer's findings and conclusions that the sign was destroyed by a windstorm and that, through Fullmer's testimony, it carried its burden of proving that the sign was destroyed as a result of a natural disaster. Fullmer testified that he visited the site several days after the storm and observed splintered and broken poles and debris scattered over a 150 foot area, and he expressed his opinion that the damage was caused by the storm. He also made a photographic record of the site as it existed on the day of his visit. (R.R. at 9–11.) Based upon this and other testimony, the hearing officer made the following pertinent findings of fact:

4. There is evidence that the sign was previously subject to vandalism in 1984 and 1989.
5. The evidence is mostly hearsay and anecdotal.
6. There are no pictures of vandalism and no evidence of the places it occurred, the extent, or the seriousness.
. . . .
9. There is no evidence of vandalism in 1991.
10. The evidence indicates that the vandalism discussed in 1991 occurred in 1989.
11. On April 8, 1991 a windstorm occurred in the area of the sign.
12. The sign blew down.

(Hearing Officer's Findings of Fact Nos. 4–6, 9–12.)

Were it not for the doctrine of incontrovertible physical facts, discussed in the body of this opinion, we could conclude at this point that DOT met its burden of proving that the sign was damaged by a windstorm and that substantial evidence supports the hearing officer's findings on this issue.

trary to human experience and the laws of nature or which flies in the face of infallible physical fact. *Seiwell v. Hines,* 273 Pa. 259, 116 A. 919 (1922). However, where the Court cannot say as a matter of law that the testimony of a witness *is* contrary to scientific principles or the laws of nature, the question of the conflict in the evidence is still for the fact-finder to resolve. 30 Am.Jur.2d *Evidence* § 1086 (1967).

*Bethlehem Mines Corp. v. Workmen's Compensation Appeal Board,* 40 Pa.Commonwealth Ct. 611, 398 A.2d 725 (1979) (emphasis in original).

■ The physical evidence of damage relevant to this discussion is summarized in the hearing officer's Finding of Fact No. 13: "Nine of twelve poles were snapped off at various heights from ground level up to 1/3 or 1/2 the height of the sign." Mike's contends that a conclusion that a windstorm caused such damage is contrary to scientific principles and in conflict with the laws of nature, referring us to the testimony of its expert witness, Donald M. Holmes, a registered professional engineer specializing in structural engineering. Mr. Holmes testified:

A ... it is an engineering principle that failure of the poles due to a wind stress occurs at the point of maximum flex stress.

. . . .

A ... if the wind first hits the sign face and is transmitted from the sign face through the stringers to the pole, the stress points come down to the lower point which is near the ground level.

. . . .

A Let me state it this way, these poles from the picture that are broken at different locations, it is possible maybe one pole, for some reason—... somehow, somebody missed it in the grading process or anything, you might have just one pole but it is very highly unlikely that this would ever occur from what you are saying.

(R.R. at 93a, 95a, 96a.) Mike's asserts that because the hearing officer did not address Holmes' testimony[7] or this scientific and engineering principle, the hearing officer improperly ignored incontrovertible physical facts, and his findings and conclusions are not supported by substantial evidence.

DOT counters that Mike's emphasis on the doctrine of incontrovertible physical facts is misplaced. Instead, says DOT, unless the court can say as a matter of law that the testimony of a witness is contrary to scientific principles or the law of nature, conflicts in testimony are for the factfinder to resolve. We agree. Although the espoused engineering principle that poles will break at the point of maximum stress may be sound, we cannot say as a matter of law that the poles supporting a sign like this would *never* break as these did in the absence of tortious conduct.[8] Mike's theory of failure falls short of being a universally accepted scientific principle such as, for example, the law of gravity. *See, e.g., Bethlehem Mines* and *Seiwell v. Hines,* 273 Pa. 259, 116 A. 919 (1922).

Neither Mike's introduction of testimony asserting an engineering and scientific theory of failure nor Mike's evidence of vandalism prevents a reasonable mind from believ-

---

7. The hearing officer did discuss a letter from another expert for Mike's, H.R. McMichael, P.E., President of Upham, Inc., registered engineers and surveyors, which expressed the opinion that the poles would not normally fail as they did in a windstorm. The hearing officer discounted the letter, in part, because McMichael did not testify. (R.R. at 154a.)

8. Various theories explain why and how materials fail. However, no one theory appears to rise to the level of a universally accepted scientific or engineering principle. A theory is a supposition; the term principle implies more. A principle is a "fundamental truth or doctrine.... A truth or proposition so clear that it cannot be proved or contradicted unless by a proposition which is still clearer." Black's Law Dictionary 1074 (5th ed.1979). Even were the premise that poles fail at their weakest point a universally accepted principle, this does not prove where that weakest point will be or that, in this case, vandalism rather than the windstorm caused the poles to break as they did. Mike's did not present evidence, such as calculations based upon an accepted mathematical formula, to demonstrate the applicability of its theory of failure to the situation at hand. *See, e.g.,* Eugene A. Avallone & Theodore Baumeister III, Marks' Standard Handbook For Mechanical Engineers 5–52, 5–53 (1987).

ing Fullmer's testimony that the sign was damaged as a result of a natural disaster.[9] Thus, this evidence, accepted by the hearing officer, provides substantial evidence to support the hearing officer's findings of fact and conclusions of law regarding the cause of damage to Mike's sign.

■ Next, Mike's argues that the hearing officer's finding that less than 50% of the sign's value remained intact was not supported by substantial evidence because DOT was required to prove *both* that less than 50% of the sign's value remained and that less than 50% of the sign remained physically intact. DOT, on the other hand, contends that it may revoke a permit when a sign is damaged due to natural disaster or nontortious conduct if *either* less than 50% of the sign's value remains or if less than 50% of the sign remains intact physically.[10] We agree with DOT. Nevertheless, we conclude that the hearing officer's finding is not supported by substantial evidence.

■ Here, the hearing officer found that the revocation was based on the fact that "less than 50% of [the sign's] *value* remained intact." (Finding of Fact, No. 19. Emphasis added.) However, DOT never presented evidence on value but rather revoked Mike's permit based on its determination that

9. Mike's offered Holmes as an expert witness, and his credentials were not challenged. However, expert testimony is given no more weight than that of other witnesses. The hearing officer may believe all, part or none of the expert's testimony. The only difference between expert testimony and that of a lay witness is that the expert witness may give opinion testimony based upon facts of record in relation to his or her area of expertise. Packel and Poulin, Pennsylvania Evidence § 702.4 (1987).

10. Fullmer testified that he revoked the permit because less than 50% of the sign remained "intact and in place," (R.R. at 15a), and "[o]nce I only see two or three uprights in place and no face in place, I know the sign is less than 50% intact." (R.R. at 41a.) However, Fullmer's conclusion is based upon DOT's definition of "intact" as "upright, in place and uninjured or not damaged" which we have held is overbroad. *Martin Media v. Department of Transportation*, 163 Pa.Commonwealth Ct. 360, 641 A.2d 630 (1994). The sign would be considered sufficiently "intact" to retain its nonconforming status if 50% of the sign face, lighting, structure, and other elements, combined, were not damaged. By adding the concepts "upright" and "in place" to the meaning of "intact," DOT expands the definition of the word beyond its commonly accepted meaning.

less than 50% of the sign remained intact on physical facts alone. Because DOT made no value appraisal, and because the only evidence of value was presented by Mike's witnesses who testified that more than 50% of the sign's value remained,[11] substantial evidence does not support the hearing officer's finding with respect to value.

Since DOT failed in its burden of proving that less than 50% of the value of the sign remained, we reverse.[12]

## ORDER

AND NOW, this 24th day of May, 1994, the order of the Secretary of the Department of Transportation, dated June 17, 1993, is reversed.

11. Mike's witnesses testified that repairs cost $6,000.00 and that the cost of totally rebuilding the sign would have been between $13,000.00 and $14,000.00. (R.R. at 89a.)

12. Because of our decision to reverse, we need not address Mike's argument that the equitable concept of laches prevents DOT from revoking the sign permit.